OPINION OF THE COURT
Joan B. Lefkowitz, J.
In 1990, defendant Consolidated Edison Company (hereafter referred to as Con Ed) offered its large commercial customers, of which there are about 4,550 such consumers, a cost savings program called "Curtailable Electric Service — Summer Savings Program” (hereafter referred to as CES). If a customer agreed to reduce electric usage during peak periods during summer months, it would receive a credit (or reduced price) towards the monthly electric bill. The CES program, established in 1989 with a tariff approved by the Public Service Commission (hereafter the PSC), was set at $15 per kilowatt where the customer would comply on a 30-minute notification.
A brochure describing the CES credit gives an example of the dollar savings on a monthly and four-month basis (at 1). On page 2 of the brochure it states, inter alia:
"Program Duration:
*274 "Guaranteed for five years (1990 through 1994)
"Credit Amount:
"$15/kw for reduced demand with 30-minute notification
"Guaranteed five-year program life (for a total of $344/kw including tax savings)”.
A more detailed pamphlet provided to potential users of the program (exhibit 6-c) provided in paragraph 9: "Customers receiving service under this Special Provision E will be eligible for service hereunder for a minimum of five years * * * All terms and conditions of this Special Provision E, including the levels of credit and penalty and number and duration of curtailments are subject to change and may differ during the period in which this Special Provision is in effect.”
The application for the CES program states at the very top thereof, in pertinent part: "This application and the furnishing of Curtailable Electric Service hereunder are subject in all respects to the provisions of the Company’s electric rate schedule and any amendments thereof, and to the rates, charges, rules, regulations and conditions therein set forth, applicable to the particular service to be supplied hereunder as the same may be in effect from time to time, all of which are hereby referred to and made part hereof.”
At the bottom of the application, it states in part: "Con Edison will supply CES service only under PSC-approved tariffs.”
Plaintiff signed on for the CES program by execution of the application on May 1, 1991 and received the appropriate credit until 1993. In May 1991, after seven years without a rate increase, Con Ed filed a rate increase with the PSC. During hearings thereon, the PSC recommended that Con Ed reduce the CES credits. Con Ed initially opposed the recommendation. A principal witness for Con Ed testified at the hearing as follows:
"Q. Are there other reasons for not reducing the monthly CES credit?
"A. Yes, issues of customer equity and fairness and assuring the success of our entire DSM[1], program require that the credit not be reduced at this time.
"Q. Please explain.
*275 "A. The customers whom the Company solicited for participation in the CES program, some of whom made significant equipment investments in order to participate, relied on the level and stability of the current monthly credit amount in doing their own cost benefit analyses and making their investment decisions. In fact, the Company’s tariff provides for the availability of the CES tariff for 5 years to prospective participants to induce them to make whatever changes in equipment or operation are necessary to participate. To now reduce the monthly credit or customer incentive payment for such customers’ participation would not only undermine a program which has achieved significant peak demand reductions since its inception in 1989, but may make our customers reluctant to participate in our other DSM programs and make it more difficult for us to achieve the aggressive goals of our entire DSM and Enlightened Energy program * * *
"Q. What is your proposal with respect to the amount of the monthly CES credit?
"A. I recommend that it should remain at least at the current level for the duration of the CES program.
"Q. If a change in the monthly credit amount is ordered in spite of your objections, do you have an alternate proposal?
"A. Yes, I propose that, at a minimum, the current level of the CES credit be maintained for the remainder of the minimum 5-year term of the Company’s commitment to the customers who are already on the program and that any reduced monthly credit be applied only prospectively to such new customers as might still apply for the program under the new rates.”
At the close of the hearings, Con Ed and the PSC entered into a settlement agreement in January 1992. It was publicized in accordance with PSC rules and was approved by the PSC in April 1992. Part of the agreement required Con Ed to reduce the CES credit in 1993 to $12 per kilowatt and thereafter to $9 per kilowatt.
Notice of the change was published. This change affected 143 participants in the program, including plaintiff. The settlement was challenged by a consumer group, which challenge was rejected by the Court. (Matter of Owners Comm. on Elec. Rates v Public Serv. Commn., 194 AD2d 77 [3d Dept 1993].) As required by the PSC, Con Ed filed a tariff approved by the PSC which changed the CES rates as of March 1993.
Plaintiff sues for damages in fraud and for breach of contract. Plaintiff claims damages of $39,208.50 as the per kilowatt dif *276 ferential credit denied it and $250,000 for the purchase and installation of generators in reliance upon the savings it believed it would receive under the original CES program. Plaintiff also requests punitive damages.
Defendant moves to dismiss the complaint on the grounds of lack of subject matter jurisdiction as the fixing of rates is within the primary jurisdiction of the PSC; the court should not proceed in the absence of a necessary party, the PSC; the action is barred by the four-month Statute of Limitations (CPLR 217); and that the complaint fails to state a cause of action because the agreement did not guarantee a fixed CES credit rate nor may Con Ed provide plaintiff with a rate not provided for in its approved tariffs.
 Defendant’s arguments concerning subject matter jurisdiction, PSC presence, primary jurisdiction and Statute of Limitations are without merit. The PSC is a creature of statute with limited powers as set forth in the Public Service Law. (88 NY Jur 2d, Public Utilities, § 29.) Its primary function is to conduct hearings on rates. (Id., §§ 48, 64.) Its expertise is not required in this action for breach of contract and fraud. It has no jurisdiction to adjudicate these claims. (Capital Tel. Co. v Pattersonville Tel. Co., 56 NY2d 11, 21 [1982]; Matter of Long Is. Light. Co. v Horn, 49 Misc 2d 717 [Sup Ct, Suffolk County 1964], revd and remanded 23 AD2d 583 [2d Dept 1965], after remand affd 24 AD2d 840 [2d Dept 1965], affd on original opn at Special Term 17 NY2d 652 [1965]; 2 NY Jur 2d, Administrative Law, §§ 181, 182.) Questions of law concerning the doctrine of impossibility and Statutes of Limitations are beyond the powers granted to the PSC. (Kovarsky v Brooklyn Union Gas Co., 279 NY 304 [1938].) The causes of action asserted herein are timely, as the four-month Statute of Limitations (CPLR 217) to review the PSC determination is inapplicable. (CPLR 213 [2], [8].)
Defendant’s last contention that the complaint fails to state a cause of action requires discussion.
It is for the court to determine whether a written agreement is ambiguous. (Van Wagner Adv. Corp. v S & M Enters., 67 NY2d 186, 191 [1986].) Reading the brochure, pamphlet and application together establishes that the terms at issue here are unambiguous. (W.W.W. Assocs. v Giancontieri, 77 NY2d 157 [1990].) Even indulging in the presumption of construction against the draftsman of the contract (22 NY Jur 2d, Contracts, § 228), Con Ed, the documents relied on by plaintiff, which form the agreement of the parties, do not guarantee a set rate *277 of credit for the CES program; only that CES credits will be given over a five-year period "subject to change * * * during the period” (exhibit 6-c), "subject * * * to the provisions of the Company’s electric rate schedule and any amendments thereto * * * as the same may be in effect from time to time” (application); and subject to "PSC-approved tariffs” (id.).
Con Ed may not deviate from rates established by the PSC that would discriminate against other customers without PSC approval. (Public Service Law § 65 [1], [2], [3]; § 66 [12], [12-b] [b].) Con Ed is bound by its tariff as approved by the PSC. (Matter of Mt. Kisco Dev. Corp. v Lundy, 37 AD2d 1040 [3d Dept 1971]; see, Willson v American Ry. Express Co., 204 App Div 59 [4th Dept 1922], affd 239 NY 562 [1924].) The case of Wackenut v Empire Gas & Elec. Co. (166 NYS 29 [Sup Ct, Cayuga County 1917]) relied on by plaintiff is inappropriate as the court there noted that it would give effect to a contractual utility rate until it was changed and superseded by the PSC. That is what occurred here, albeit as a result of a settled rate increase application.
Resolution of the rate increase by Con Ed by compromise with the PSC, which has a legislative function to set rates (88 NY Jur 2d, Public Utilities, § 64), was appropriate from a consumer, procedural and substantive point of view. (State Administrative Procedure Act § 301 [5]; Matter of Owners Comm. on Elec. Rates v Public Serv. Commn., 194 AD2d 77, supra.)
The arguments being advanced with respect to whether plaintiff has a viable claim relate to the doctrine of impossibility of performance by supervening events; in this case, a change in the tariff, rate or credit under the CES program, as required by the PSC. Plaintiff contends that the doctrine is not applicable as Con Ed contributed to the situation by asking for a rate increase and then agreeing to reduce the CES credit. Con Ed submits that it was not precluded from requesting a rate increase and acted in good faith at all times.
Every commercial contract carries an obligation that the parties shall act in good faith with respect to the promises to be performed. (Feld v Levy & Sons, 37 NY2d 466, 470 [1975]; Division of Triple T. Serv. v Mobil Oil Corp., 60 Misc 2d 720, 726 [Sup Ct, Westchester County 1969, Gagliardi, J.], affd 34 AD2d 618 [2d Dept 1970], Iv denied 26 NY2d 614, stay denied 26 NY2d 1020 [1970]; Restatement [Second] of Contracts § 205; 22 NY Jur 2d, Contracts, § 201.)
Impossibility of performance caused by a superseding judicial, executive or administrative order is a recognized *278 defense to a claim under a contract affected by such order. (6 Corbin, Contracts § 1346; Restatement [Second] of Contracts §§ 261, 264; 18 Williston, Contracts §§ 1933, 1939 [3d ed 1961]; 17A Am Jur 2d, Contracts, § 696; 17A CJS, Contracts, § 467.) Generally, "the excuse of impossibility of performance is limited to the destruction of the means of performance by an act of God, vis major, or by law.” (407 E. 61st Garage v Savoy Fifth Ave. Corp., 23 NY2d 275, 281 [1968]; Annotation, Contract-Performance-Impossibility, 84 ALR2d 12, §§ 6, 7 [b].) Recently, in Kel Kim Corp. v Central Mkts. (70 NY2d 900, 902 [1987]), the Court of Appeals summarized the principles of the doctrine as follows: "Generally, once a party to a contract has made a promise, that party must perform or respond in damages for its failure, even when unforeseen circumstances make performance burdensome; until the late nineteenth century even impossibility of performance ordinarily did not provide a defense (Calamari and Perillo, Contracts § 13-1, at 477 [2d ed 1977]). While such defenses have been recognized in the common law, they have been applied narrowly, due in part to judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances (see, Wallach, The Excuse Defense in the Law of Contracts: Judicial Frustration of the U.C.C. Attempt to Liberalize the Law of Commercial Impracticability, 55 Notre Dame L Rev 203, 207 [1979]). Impossibility excuses a party’s performance only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible. Moreover, the impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract (see, 407 E. 61st Garage v Savoy Fifth Ave. Corp., 23 NY2d 275; Ogdensburg Urban Renewal Agency v Moroney, 42 AD2d 639).” In Kel Kim, the plaintiff, as lessee of demised premises, was required by contract to secure a certain amount of liability insurance by a certain date. Plaintiff was unable to do so by reason of a crisis in the insurance business. Plaintiff sued for a declaratory judgment to avoid eviction, claiming that the doctrine of impossibility excused its performance. The Court of Appeals held the doctrine inapplicable as the possibility of not being able to obtain the requisite amount of insurance could have been foreseen and guarded against in the contract.
Clearly, one of the parties to a contract may assume the risk of a condition, including a change that affects the economics of *279 a transaction. (Kinser Constr. Co. v State of New York, 204 NY 381 [1912]; 6 Corbin, Contracts § 1328.) Where the contract is silent regarding a risk, foreseen or not, the courts sometime imply a condition that goes to the essence of the deal regarding the continued existence of the thing upon which the contract is based. (Stewart v Stone, 127 NY 500 [1891]; Ewing Co. v New York State Teachers’ Retirement Sys., 14 AD2d 113 [3d Dept 1961], affd 11 NY2d 749 [1962]; 6 Corbin, Contracts § 1331; 18 Williston, Contracts § 1937 [3d ed 1961]; Annotation, op. cit., 84 ALR2d 12, § 9; 22 NY Jur 2d, Contracts, § 344.) In Stewart v Stone (supra, at 507) the Court said: "It is true that where an absolute executory contract is made, the contractor is not excused by inability to execute it caused by unforeseen accident or misfortune, but must perform or pay damages unless he has protected himself against such contingency by stipulation in the contract. (Harmony v. Bingham, 12 N. Y. 99; Tompkins v. Dudley, 25 id. 272; Wheeler v. Conn. Mutl. L. Ins. Co., 82 id. 543.) But there may be in the nature of a contract an implied condition by which he will be relieved from such unqualified obligation, and when, in such case, without his fault, performance is rendered impossible, it may be excused. That is so when it inherently appears by it to have been known to the parties to the contract, and contemplated by them when it was made, that its fulfillment would be dependent upon the continuance or existence at the time for performance, of certain things or conditions essential to its execution. Then in the event they cease, before default, to exist or continue, and thereby performance becomes impossible without his fault, the contractor is, by force of the implied condition to which his contract is subject, relieved from liability for the consequences of his failure to perform. (People v. Bartlett, 3 Hill, 570; Dexter v. Norton, 47 N. Y. 62; Booth v. S.D.R. Mill Co., 60 id. 491; Taylor v. Caldwell, 3 B. & S. 826.)”
Clearly, therefore, it would seem that had plaintiff desired to terminate the contract when the CES credit was reduced, it could have done so without incurring liability (22 NY Jur 2d, Contracts, § 365).[2] The question, however, is whether defendant is also excused from performance.
A supervening event excuses a promisor’s duty if the event is not caused by the actions of the promisor. (Restatement [Second] of Contracts § 265; AMF, Inc. v Cattalani, 77 AD2d *280 779 [4th Dept 1980], supra; Crown Embroidery Works v Gordon, 190 App Div 472 [1st Dept 1920]; 22 NY Jur 2d, Contracts, § 366; 7 Encyc NY Law, Contracts, § 1713; 6 Corbin, Contracts § 1329; 18 Williston, Contracts § 1939, at 48 [3d ed 1961]; Restatement, Contracts § 457, illustration 3, at 851; Calamari and Perillo, Contracts §§ 13-4, 13-13 [2d ed]; Simpson, Contracts § 178 [2d ed]; 17A CJS, Contracts, §§ 459, 463 [1]; 17A Am Jur 2d, Contracts, §§ 679, 695; Annotation, op. cit., 84 ALR2d 12, § 12; see, W. R. Grace & Co. v Rubber Workers, 461 US 757, 767, n 10 [1983]; Uniform Commercial Code § 2-615 [a].) To excuse the promisor’s performance by reason of a supervening act, it is generally understood that such act was unforeseeable when the contract was created, the events causing the result were fortuitous and beyond the control of either party to the contract and the event, when it occurred, was vigorously challenged by diligent efforts of the promisor to avoid the consequences of impossibility. (Id.; 22 NY Jur 2d, Contracts, § 355.)
In General Aniline & Film Corp. v Bayer Co. (305 NY 479 [1953]) it was held that notwithstanding the defendant’s agreement to a consent order with the government that established antitrust violations, which presumably precluded defendant from honoring a contractual promise to plaintiff, a nonparty to the agreement, the plaintiff could litigate the issues revolving around illegality (or impossibility) of the contract. This decision instructs us that the change in the CES credits agreed to by Con Ed, as part of a compromise on its rate increase application, does not ipso facto provide a conclusive defense to plaintiff’s breach of contract claims and, in the procedural context presented by way of the instant motion to dismiss, does not negate plaintiff’s breach of contract cause of action.
In Lowenschuss v Kane (367 F Supp 911 [SD NY 1973]) defendants made a tender offer for shares of stock without a "litigation-out” clause. The offer was challenged on grounds of securities and antitrust violations and defendants were enjoined by the court from proceeding with the offer. Plaintiff had tendered shares and sued to complete the transaction. Defendants urged impossibility as a defense. The District Court accepted that argument finding that the defendants committed no purposeful act to thwart the deal and vigorously defended the tender offer in the injunction proceeding. The complaint was dismissed. This was reversed by the Second Circuit Court of Appeals (520 F2d 255 [1975]). That court concluded that an issue of fact existed, requiring discovery, concerning defendants’ conduct which led to the injunction because if defendants *281 made the tender offer with knowledge of sufficient facts that would result in the offer being enjoined, that knowledge might constitute fault and abrogate the defense of impossibility of performance.
Similarly, in Studio 54 Disco v Pee Dee Jay Amusement Corp. (81 AD2d 911 [2d Dept 1981]) the Court followed the Circuit Court of Appeals opinion in Lowenschuss (supra). In Studio 54, defendant was under contract to plaintiff to deliver property to defendant but had been enjoined by another party from completing the transaction and had been served with a restraining notice by a creditor. Plaintiff’s motion for summary judgment was granted by the motion court. The Appellate Division, Second Department, reversed and held (81 AD2d, at 912): "Under the modern doctrine of impossibility of performance, a party restrained by a judicial order will be excused from performance of a contract if the party did not contribute to the issuance of the order (Lowenschuss v Kane, 520 F2d 255, 265; 6 Corbin, Contracts, § 1346; 18 Williston, Contracts [3d ed], § 1939, p 49; Restatement, Contracts, §§ 457; 458; 10 NY Jur, Contracts, § 373, p 361). Wilkinson v First Nat. Fire Ins. Co. of Worcester (72 NY 499, 505), relied on by Special Term, is distinguishable (see 6 Corbin, Contracts, § 1346, p 429). Here, the defendant, in the litigation with the third party out of which the orders and notice emanated, resisted vigorously the claims of the third party and was ultimately successful on appeal. Hence, sufficient appeared on the face of the papers submitted on plaintiff’s motion for summary judgment to raise a triable issue with respect to the defendant’s actions, if any, which may have contributed to the issuance of the orders and notice.”
While the last three cases discussed involved supervening judicial orders, the result should be no different as to administrative order or directives. (Cf., 18 Williston, Contracts § 1938, at 41, n 12 [3d ed 1961].)
A party is not necessarily at fault, within the meaning of the principle that excuses performance by reason of impossibility, where it does an act which is lawful, although such act ultimately frustrates the purpose of a contract and renders performance "impossible. (Mawhinney v Millbrook Woolen Mills, 231 NY 290, 300 [1921]; Brick Presbyt. Church v Mayor, Aldermen, & Commonalty of City of N. Y., 5 Cow 538 [1826]; 18 Williston, Contracts § 1938, at 41 [3d ed 1961].)
It was seemingly innocuous for Con Ed to seek a rate increase and presumably it was not barred by the CES agree *282 ment with the plaintiff from going forward with its request even when the PSC suggested that CES credits be reduced. Indeed, it may be forcefully argued that the plaintiff assumed the risk of an adverse change in the CES credits by reason of the language set forth in the application and pamphlet. However, plaintiff certainly did not assume the risk that Con Ed would violate its good-faith obligation to provide the called-for performance under the agreement by bargaining away plaintiffs benefits under the program by way of a settled rate increase with the PSC.
At bar, therefore, the court concludes that a viable claim is presented at this time regarding the conduct of Con Ed’s involvement with settlement of its rate increase application as its "performance should be excused only in extreme circumstances”. (Kel Kim Corp. v Central Mkts., 70 NY2d 900, 902, supra.) On this motion, Con Ed has the burden of establishing each element of its impossibility putative defense, but has not carried that burden at this time. (17A Am Jur 2d, Contracts,
§ 674.)
On this record, absent special circumstances not revealed herein, the purchase and installation of generators by plaintiff was probably not within the contemplation of the defendant within the context of the contract. (American List Corp. v U.S. News & World Report, 75 NY2d 38 [1989]; Kenford Co. v County of Erie, 73 NY2d 312 [1989].) Generally, "[t]he only losses assessable against a contract violator are those which flow directly from the breach and were within the contemplation of the parties when the contract was made.” (Richardson, Contracts § 427, at 324 [1951]; 36 NY Jur 2d, Damages, §§ 39, 40.) Interestingly, the record reveals that plaintiff contracted for the generators on April 10, 1991, before contracting with defendant for the CES program. Consequently, a legitimate inquiry exists concerning alleged misrepresentations and reliance. (7 Encyc NY Law, Contracts, §§ 2105, 2119.) Absent justifiable reliance on alleged misrepresentations, there is no fraud. (2 NY PJI 90-93 [1996 Supp].)
Similarly, since no claim is advanced of a systematic, continuous wrongdoing aimed at the public generally, the alleged underlying private wrong is redressable'in compensatory, not punitive, damages. (Reinah Dev. Corp. v Kaaterskill Hotel Corp., 59 NY2d 482 [1983]; Garrity v Lyle Stuart, Inc., 40 NY2d 354 [1976].)
Nonetheless, on this motion to dismiss the complaint in toto , for failure to state a cause of action, the court assumes that *283 the allegations in the complaint are true. (Morone v Morone, 50 NY2d 481 [1980]; 219 Broadway Corp. v Alexander’s, Inc., 46 NY2d 506, 509 [1979].) However, it also considered the evidentiary material submitted because the inquiry really is whether the plaintiff has a cause of action. (Guggenheimer v Ginzburg, 43 NY2d 268 [1977]; cf., Rovello v Orofino Realty Co., 40 NY2d 633 [1976].) Having determined that the breach of contract cause of action is viable, the court is not required to review the propriety of the other claims in denying the motion to dismiss. (4 Weinstein-Korn-Miller, NY Civ Prac ¶3211.38; Siegel, NY Prac § 265, at 396 [2d ed].)
Accordingly, the motion to dismiss the complaint is denied. Defendant shall serve its answer within 20 days after service of a copy of the order hereon, with notice of entry. Defendant may assert such affirmative defenses as it believes apply, including impossibility of performance and illegality. On completion of pretrial discovery, either party, if they be so advised, may move for summary judgment.

. DSM is a Con Ed strategy known as Demand Side Management which incorporates CES in an over-all scheme to manage the amount of electric power consumed by utility consumers.

. An issue may exist with respect to plaintiff’s obligation to mitigate damages under the last three years of the CES programs. (AMF, Inc. v Cattalani, 77 AD2d 779 [4th Dept 1980]; 36 NY Jur 2d, Damages, §§ 21, 126.)