PUBLISH

UNITED STATES COURT OF APPEALS

**Filed 12/23/96**

TENTH CIRCUIT

CENTRAL KANSAS CREDIT UNION,

Plaintiff-Appellant,

v.

No. 95-3135

MUTUAL GUARANTY
CORPORATION,

Defendant-Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 93-4255)

Ron D. Beal, Klenda, Mitchell, Austerman & Zuercher, L.L.C., Wichita, Kansas, for
Plaintiff-Appellant.

James D. Oliver and James L. Grimes, Jr., Foulston & Siefkin L.L.P., Topeka, Kansas,
and Robert Kirk Walker and William Carriger, Strang, Fletcher, Carriger, Walker, Hodge
& Smith, Chatanooga, Tennessee, for Defendant-Appellee.

Before HENRY, BRISCOE, and LUCERO, Circuit Judges.

HENRY, Circuit Judge.

This appeal arises from a dispute between Central Kansas Credit Union

("CKCU"), a Kansas credit union with its principal offices in Hutchinson, Kansas, and

Mutual Guaranty Corporation ("Mutual Guaranty"), a Tennessee nonprofit public corporation created by the Tennessee legislature to insure the deposits of account holders in its member credit unions. CKCU claims that it is entitled to recover the capital contribution and special assessment that it lost when it withdrew from Mutual Guaranty, but the district court granted summary judgment in favor of Mutual Guaranty. On appeal, CKCU makes eight arguments, all related to the legality or enforceability of the provision in Mutual Guaranty's bylaws under which CKCU forfeited its investments when it withdrew from Mutual Guaranty. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. BACKGROUND

Until 1982, CKCU's deposits were guaranteed by Secured Savings Credit Union of Wichita, Kansas ("Secured Savings"). In 1982, the financially troubled Secured Savings merged with Mutual Guaranty. Following the merger, CKCU, like other Kansas credit unions that had been insured by Secured Savings, entered into a contract of insurance with Mutual Guaranty which incorporated certain terms of the merger agreement. In 1989, a dispute arose between Mutual Guaranty and its Kansas member credit unions over the credit unions' liability under the merger agreement for their pro rata share of all losses and expenses incurred by Mutual Guaranty in the rehabilitation, merger, liquidation, and satisfaction of indemnity obligations of certain credit unions.

2

While some of the Kansas credit unions litigated this dispute, CKCU decided to settle by paying Mutual Guaranty $266,818.48 in exchange for a full release from these liabilities.

However, a second disagreement later arose between CKCU and Mutual Guaranty. Under the contract of insurance between these parties, CKCU had agreed to comply with Mutual Guaranty's bylaws. Among other obligations, the bylaws required CKCU, like all members, to make three kinds of capital contribution to Mutual Guaranty: to deposit with Mutual Guaranty an initial capital contribution equal to one percent of CKCU's shares and insured accounts; to deposit each year any additional amounts needed to maintain the initial one percent contribution; and from time to time to pay special assessments to Mutual Guaranty. In 1987, Mutual Guaranty's board of directors, alarmed at the possibility of member failures, voted unanimously to amend the corporation's bylaws to include a forfeiture provision, which authorized Mutual Guaranty to retain one hundred percent of the capital contribution, including special assessments, of any withdrawing member credit union. The president of CKCU, Ron Ogle, was a member of Mutual Guaranty's board of directors and voted in favor of the amendment. The board formally notified CKCU of the bylaw amendment by letter.

In 1991, the Kansas legislature amended Kan. Stat. Ann. § 17-2246 to require every Kansas credit union to apply for federal share insurance provided by the National Credit Union Share Insurance Fund (NCUSIF). CKCU accordingly procured share insurance from NCUSIF and, in December 1992, withdrew from membership in Mutual

3

Guaranty. Over the course of its membership with Mutual Guaranty, CKCU had made capital contributions of $226,684.31 and satisfied special assessments of $105,763.45. Upon CKCU's withdrawal from membership, Mutual Guaranty retained these funds (hereinafter collectively referred to as the "capital contribution") pursuant to its amended bylaw.

CKCU brought this action in the United States District Court for the District of Kansas seeking recovery of both the settlement it paid to Mutual Guaranty in the 1989 dispute and the capital contribution it lost upon withdrawing from Mutual Guaranty. Both parties filed motions for summary judgment. The district court granted Mutual Guaranty's, and denied CKCU's, motion for summary judgment. On appeal, CKCU challenges this decision only with respect to Mutual Guaranty's retention of the capital contribution.

CKCU presents eight grounds, all previously rejected by the district court, for not enforcing the 1987 amendment that added the contested forfeiture provision to Mutual Guaranty's bylaws: (1) CKCU's failure to maintain its membership in Mutual Guaranty is excused under the doctrine of impracticability of performance; (2) Kan. Stat. Ann. § 17-2255 requires that the disputed funds be returned to CKCU; (3) the contested bylaw provision is an unenforceable "penalty;" (4) Mutual Guaranty's general reservation of power to amend its bylaws is limited by Tennessee law to amendments that do not decrease a member's benefits; (5) the bylaw amendment was unreasonable and therefore

4

not enforceable; (6) a 1991 amendment to Kan. Stat. Ann. § 17-2246, requiring state approval of the bylaw amendments of nonfederal insurers, applies retroactively to Mutual Guaranty's 1987 bylaw amendment; (7) Mutual Guaranty failed to satisfy an obligation arising under the contract of insurance to obtain CKCU's signature on the bylaw amendment; and (8) Mutual Guaranty failed to give CKCU timely written notice of the bylaw amendment.[1]

## II. DISCUSSION

Our review of the district court's order granting Mutual Guaranty's, and denying CKCU's, motion for summary judgment is governed by the following well-established standard:

> We review the grant or denial of summary judgment de novo, applying the same legal standard used by the district court pursuant to Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When applying this standard, we apply the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. If there is no genuine issue of material fact in dispute,

---

[1] The district court, noting the choice of law clause in the contract of insurance, applied Tennessee law to "most of these issues." Aplt's Br., Addendum at 22 n.4. For this reason, and both because bylaws are generally governed by the laws of the state of incorporation, see Restatement (Second) of Conflict of Laws § 309 (1969), and because the parties do not object to the district court's choice of law, see Missouri Pacific R.R. Co. v. Kansas Gas & Elec. Co., 862 F.2d 796, 798 n. 1 (10th Cir. 1988), we apply Tennessee law except when interpreting Kansas statutes and where otherwise noted.

then we next determine if the substantive law was correctly applied by the district court.

Wolf v. Prudential Ins. Co. of America, 50 F.3d 793, 796 (10th Cir. 1995) (citations omitted).

## A. Impracticability of performance

CKCU argues that it is entitled to reclaim its capital contribution because the 1991 change in Kansas law, which required credit unions to insure their deposits with NCUSIF, see Kan. Stat. Ann. § 17-2246, made it impracticable for it to remain a member of Mutual Guaranty. The district court held that the doctrine of impracticability of performance does not apply to CKCU's predicament. Because whether impracticability of performance exists is generally considered to be a question of law we apply de novo review. See Sunflower Electric Coop., Inc. v. Tomlinson Oil Co., 638 P.2d 963, 969 (Kan. App. 1981).

Impracticability of performance is a legal justification or excuse for nonperformance of a contractual obligation. Restatement (Second) of Contracts § 261 (1981). After a contract is made, if a party's performance is made impracticable by the occurrence of an event, the nonoccurrence of which was a basic assumption upon which the contract was made, that party is relieved of the obligation. Id. Section 264 of the Restatement sets forth the particular rule in case of a change of law:

> If the performance of a duty is made impracticable by having to comply with a domestic or foreign governmental regulation or order, that regulation or order is an event the non-occurrence of which was a basic assumption on which the contract was made.

Id. § 264. Therefore, the change of law excuses the party from its obligation. Id. § 261.

CKCU attempts to characterize its contract with Mutual Guaranty in terms that fit the impracticability doctrine as follows: (1) under the contract, CKCU was entitled to retain ownership of its capital contribution only so long as it remained a member of Mutual Guaranty; (2) the nonexistence of the 1991 statutory amendment requiring CKCU to obtain insurance from the federal insurer was a basic assumption of its contract with Mutual Guaranty; (3) the 1991 amendment made it impracticable for CKCU to remain a member of Mutual Guaranty; (4) therefore, CKCU should be excused from its obligation to "perform," that is, to remain a member.

We agree with the district court's conclusion that this characterization of the contract does not "fit[] well within the impracticability of performance doctrine," Aplt's Br., Addendum at 23 (district court's order), though our conclusion rests on different reasons. The district court found that CKCU's continued membership in Mutual Guaranty was not "a matter that the parties merely assumed," id., but rather that it was expressly agreed to in the contract. Thus, the district court concluded that, because continued membership was not a "basic assumption," Restatement (Second) of Contracts § 261, the doctrine did not apply.

7

We read CKCU's argument differently. We believe CKCU does not mean that the basic assumption was that it would remain a member; rather, we think CKCU means that the basic assumption was that the law would not change so as to render it extremely inconvenient to remain a member.

Nevertheless, the doctrine is still inapposite. As Mutual Guaranty argues, impracticability of performance is properly raised only as an excuse for a party's nonperformance of a contractual obligation. See Kansas City, Mo. v. Kansas City, Kan., 393 F.Supp. 1 (W.D. Mo. 1975). Kansas City illustrates the proper application of the doctrine to excuse a party from an obligation to perform actual services in the future. The court assumed for the sake of argument that the plaintiff had agreed to dispose of the defendant's sewage waste in perpetuity. The subsequent enactment of federal environmental legislation had required the expensive treatment of the waste. The court held that this unforeseen burdensome expense excused the plaintiff from performing, that is, from continuing to dispose of the waste. 393 F. Supp. at 6-7.

In the instant case, CKCU was under no comparable obligation to perform any act in the future. Instead, what CKCU seeks is to reclaim funds it has already paid and from which it has derived a benefit. CKCU struggles in attempting to characterize the remedy it seeks as a discharge from some unfulfilled obligation to perform. But recognizing that it cannot claim that that obligation was merely remaining a member of Mutual Guaranty, since it has already gotten out of that "obligation," CKCU describes it somewhat

8

awkwardly as "[r]emaining a member of [Mutual Guaranty] so as to remain the owner of [CKCU's] deposits." Aplt's Br. at 14-15. But this stretches beyond recognition the concept of a contractual obligation. The truth is that no further performance is required of CKCU. The doctrine of impracticability of performance simply does not apply in this situation.[2] See Wilson v. Page, 325 S.W.2d 294, 298 (Tenn. App. 1958) (treating the doctrine as an excuse for nonperformance, though declining to apply it to the facts of the case for other reasons).

Furthermore, as noted above, impracticability of performance may only be invoked when a basic assumption was that the intervening event would not occur. Restatement (Second) of Contracts §§ 261, 264; see Dubois v. Gentry, 184 S.W.2d 369, 370 (Tenn. 1945) ("[I]f the performance of a contract becomes impossible by contingencies which should have been foreseen and provided against in the contract, the non-performance will

_____

[2]     CKCU's claim should more accurately come under the rubric of frustration of commercial purpose, which "deals with the problem that arises when a change in circumstances makes one party's performance virtually worthless to the other" and which is "distinct from the problem of impracticability . . . because there is no impediment to performance." Restatement (Second) of Contracts § 265 cmt. a. See Williams v. Whitehead, 854 S.W.2d 895, 897 (Tenn. App. 1993); North American Capital Corp. v. McCants, 510 S.W.2d 901, 903-04 (Tenn. 1974). Because CKCU does not attempt to so characterize its predicament, we need not consider this potential claim. We note, however, that "relief will not be granted if it may be inferred from either the language of the contract or the circumstances that the risk of the frustrating occurrence . . . should properly be placed on the party seeking relief." 7200 Scottsdale Rd. Gen'l Partners v. Kuhn Farm Mach., Inc., 909 P.2d 408, 415 (Ariz. App. 1995) (citing Restatement (Second) of Contracts § 265 cmt. b). As discussed below, in this case the forfeiture provision expressly placed the risk of any "frustrating occurrence" on CKCU.

not be excused." (citation and internal quotation marks omitted)).  CKCU concedes that Mutual Guaranty "was aware of states considering requiring all credit unions to obtain their insurance from the NCUSIF" when it amended its bylaw.  Aplt's Br. at 25.  CKCU president Ron Ogle, who attended the October 1987 board meeting at which this issue was discussed, must also have been aware of this possibility.  Moreover, even in 1982 when CKCU initially agreed to be bound by Mutual Guaranty's bylaws, the possibility of member withdrawals was expressly provided for by means of a forfeiture provision.  Given the hostile economic climate at the time these events transpired, the withdrawal of a member presented a grave threat to Mutual Guaranty and to its remaining members, including--so long as it was a member--CKCU.  The status quo was <u>not</u>, in the parlance of the impracticability doctrine, a "basic assumption"; on the contrary the parties, anticipating that changing circumstances might prompt certain members to withdraw, agreed specifically that any withdrawing member would bear the associated costs of reduced membership by forfeiting the funds on which the corporation's financial stability rested.  In light of this express contractual provision, we find it significant that CKCU cites no cases in which the impracticability of performance doctrine has been invoked to excuse a party from paying a forfeiture expressly provided for in the contract.  We decline to extend the doctrine to the point where it would thwart the parties' express agreement to place the costs of withdrawal on the withdrawing party.  <u>See</u> <u>Winfree v. Educators Credit Union</u>, 900 S.W.2d 285, 289 (Tenn. App. 1995) ("The cardinal rule for interpretation of

10

contracts is to ascertain the intention of the parties from the contract as a whole and to give effect to that intention consistent with legal principles.").[3]

## B.  Kan. Stat. Ann. § 17-2255

CKCU next argues that the retention of its capital contribution violates two Kansas statutes which regulate guarantee corporations, and that the district court misconstrued these statutes.  We review de novo the district court's interpretation of a state statute. Reynolds v. School Dist. No. 1, 69 F.3d 1523, 1536 (10th Cir. 1995).

Kan. Stat. Ann. § 17-2255 provides:

Investment of funds; funds property of credit unions making payments; withdrawal of funds by credit union, conditions.

---

[3]Some authorities have suggested that in order for impracticability to excuse a promisor's obligation, the supervening act must have been "vigorously challenged by diligent efforts of the promisor."  See J.J. Cassone Bakery, Inc. v. Consolidated Edison Co., 638 N.Y.S.2d 898, 904 (N.Y. Sup. Ct. 1996) (citing 22 N.Y. Jur.2d, Contracts § 355).  As discussed below, CKCU has offered no evidence that it vigorously challenged, nor even that it did not support, the 1991 amendment to Kan. Stat. Ann. § 17-2246.  See Tucker v. Hundley, 452 S.W.2d 658, 660 (Tenn. App. 1969) ("Impossibility of performance caused by the promisor or by those in privity with him, or by developments which he could have prevented or avoided or remedied by appropriate corrective measures, does not exclude him from liability for his nonperformance of the contract."); Wilson v. Page, 325 S.W.2d 294 at 299 ("'There is no principle of law better settled than that a breach by the promisor of his unconditional contract lawfully entered into is not to be excused by any act of his own or those in privity with him which prevented or rendered impossible the performance of his agreement.'" (quoting Buchanan v. Louisiana Purchase Exposition Co., 148 S.W. 26, 28 (Mo. 1912)).  Although we find CKCU's conduct troubling in light of the position it now takes, it is not clear that CKCU had power to effect passage of the § 17-2246 amendment, and thus we do not rest our conclusion on this point.

11

> . . . <u>All funds collected and any interest paid thereon by a guarantee corporation shall belong to the credit union which pays in such funds</u> [with certain exceptions not contested in this case]. Any funds returned to a credit union, the shares of whose members are guaranteed by a guarantee corporation, shall be returned in such a manner as not to endanger the guarantees given to other credit unions by such guarantee corporations. <u>Any funds returned to a credit union shall first be subject to reduction incurred as a result of guaranteeing the shares of credit unions.</u>

Kan. Stat. Ann. § 17-2255 (emphasis added). CKCU focuses its argument on the first sentence of this provision, urging that the capital contribution continued to "belong to" CKCU, and claiming erroneously that "the statute makes no exception to this rule." Aplt's Br. at 18. The district court, setting its sights on the last sentence of the statute, found that Mutual Guaranty's retention of CKCU's capital contribution constituted a "reduction incurred as a result of guaranteeing the shares of [the other member] credit unions." Kan. Stat. Ann. § 17-2255. Moreover, the court concluded that the statute did not preclude a guarantee corporation and a credit union from expressly agreeing that the credit union would relinquish a portion of its investment upon withdrawal. We agree; there is simply nothing in the statute to suggest otherwise.

Some confusion arises as a result of the ambiguous drafting of Kan. Stat. Ann. § 17-2254, which provides, in relevant part, that "[c]ontracts written by a guarantee corporation under the provisions of this act shall provide for . . . (e) [c]ancellation by either the credit union or the guarantee corporation and the return of any unused portion of the investment, if any, <u>with penalties</u>." Kan. Stat. Ann. § 17-2254 (emphasis added). CKCU argues that the phrase "with penalties" means that any penalties previously

12

deducted must be returned along with the rest of the unused portion, and that the legislature would have said "less penalties" if it meant that penalties could be deducted from the amount returned.

We are not convinced. We believe a more natural construction is that "with penalties" means "subject to any penalties." See Knight v. Snap-On Tools Corp., 3 F.3d 1398, 1405 (10th Cir. 1993) (adopting an interpretation that was "the most natural reading of the statute"). It would defy logic for the legislature to have created a statutory scheme that allowed a guarantee corporation to impose penalties on a member credit union, only to require that such penalties be returned to the credit union upon withdrawal. Furthermore, Mutual Guaranty's contract of insurance and bylaws, which then specified that fifty percent of a withdrawing credit union's investment would be retained by Mutual Guaranty, were approved in 1982 by the Kansas administrator of credit unions. Despite CKCU's admonitions against inferring anything about the validity of the amendment from this action, the implicit interpretation of a Kansas statute by the administrator charged with that duty bolsters the view that the amendment did not violate the statute. See Macias v. New Mexico Dep't of Labor, 21 F.3d 366, 369-70 n. 3 (10th Cir. 1994) (citing the "presumption of validity [that] attaches to [state] agency action").

We conclude that the district court interpreted the relevant statutes correctly and that Mutual Guaranty's amended bylaws did not violate them.

13

## C.  Enforceability of a "penalty"

CKCU contends that the forfeiture provision in Mutual Guaranty's bylaws is a "penalty," defined as "a sum inserted in a contract, not as the measure of compensation for its breach, but rather as a punishment for default."  22 Am. Jur. 2d *Damages* § 684 (1988).  CKCU further argues that such provisions are not enforceable under the common law.  However, the district court held that Kan. Stat. Ann. § 17-2254(e) explicitly contemplates that a guarantee corporation contract may provide for a penalty.  We apply de novo review to the district court's interpretation of § 17-2254(e).  See Reynolds, 69 F.3d at 1536.

> Section 17-2254 provides:
>
> Contract provisions.  Contracts written by a guarantee corporation under the provisions of this act shall provide for:
>> (a)  The minimum investment required by a credit union;
>> (b)  Any additional periodic investment required as a condition for continuing the guarantee of credit union member shares and how such investment shall be determined;
>> (c)  The amount of the guarantee;
>> (d)  The period for which the guarantee shall be in force and provisions for renewal;
>> (e)  Cancellation by either the credit union or the guarantee corporation and the return of any unused portion of the investment, if any, with penalties;
>> (f)  All standards of equipment type and operation which must be met as a condition to a continuing guarantee and how such standards will be determined; and
>> (g)  Conditions under which payment will be made, and to whom and in what manner payment will be made.

Kan. Stat. Ann. § 17-2254 (emphasis added).

14

Section 17-2254(e) clearly and unambiguously contemplates the imposition of "penalties" on a member credit union.  CKCU argues that § 17-2254 applies only to annual assessments, and not to either its initial capital contribution or special assessments.  We conclude that there is simply no basis for this claim: the statute expressly refers to "[t]he minimum investment required by a credit union," Kan. Stat. Ann. § 17-2254(a), and to "[a]ny additional periodic investment," id. § 17-2254(b) (emphasis added).

In any case, we hold that the forfeiture provision in Mutual Guaranty's bylaws is not a penalty because it did not punish CKCU for defaulting on a contractual obligation.  A penalty "involves the enforcement of an obligation to pay a sum fixed by law or agreement of the parties as punishment for the failure to fulfill some primary obligation." 5 Samuel Williston, A Treatise on the Law of Contracts § 770 (3d ed. 1961).  As we have stated above, CKCU's withdrawal from membership in Mutual Guaranty was not a failure to fulfill an obligation; it was simply a termination of the contract, for which the terms of the contract expressly provided.  See Aplt's App. vol. I, at 60-61 (providing that the contract "may be terminated at any time for good cause under conditions set forth by the statutes of the State of Tennessee, or the charter and bylaws of the Corporation"); id. at 165-66 (Mutual Guaranty's bylaw providing that Mutual Guaranty shall retain the capital contributions of withdrawing credit unions).  See also 22 Am Jur.2d Damages § 684 (1988) (defining a "penalty" as "a punishment for default"); Black's Law Dictionary 417 (6th ed. 1990) (defining a "default" as "the omission or failure to perform a legal or

15

contractual duty, to observe a promise or discharge an obligation . . .or to perform an agreement" and describing the term as "embrac[ing] the idea of dishonesty, and of wrongful act" (citations omitted)).

### D.  Mutual Guaranty's authority to increase the withdrawal penalty

CKCU contends that Mutual Guaranty lacked authority to increase to one hundred percent the proportion of a member's capital contribution forfeited upon withdrawal. Although CKCU concedes that it agreed in the contract of insurance to be bound by Mutual Guaranty's bylaws, including subsequent amendments, it cites a 1933 Tennessee Supreme Court case which holds that "the power reserved by a mutual benefit society to amend its laws does not authorize it to decrease the benefits to which a member is entitled by the terms of his contract."  Hazelwood v. Railroad Employees' Mutual Relief Society, 64 S.W.2d 15, 16 (Tenn. 1933); see also Gaut v. Supreme Council Am. Legion of Honor, 64 S.W. 1070 (Tenn. 1901).

The district court rejected this argument, holding that "Hazelwood represents a narrow exception taken by some courts to what is otherwise a broad general rule." Aplt's Br., Addendum at 26.  The "general rule," the court held, is that where a member of a mutual society "'agrees to be bound by subsequent changes or amendments, his agreement will or may be enforced, even though his rights are thus injuriously affected.'" Id. (quoting 36 Am. Jur. 2d *Fraternal Orders and Societies* § 20 (1968)).  Like the district

16

court, Mutual Guaranty also attempts to distinguish <u>Hazelwood</u> and <u>Gaut</u> from this case, on the grounds that in both of those cases the bylaw amendments held to be unenforceable affected "a vested right." Aple's Br. at 25.

We agree with the district court that these cases are not dispositive, but we reach this conclusion for different reasons. In both of the cited cases, a mutual benefit society amended its bylaws so as to reduce substantially the life insurance benefits owed to the beneficiary upon the death of the member. See <u>Hazelwood</u>, 64 S.W.2d at 15; <u>Gaut</u>, 64 S.W. at 1074-75. Here, by contrast, CKCU does not allege that its insurance benefits would have been reduced had it remained a member of Mutual Guaranty; nor had the plaintiffs in the cited cases unilaterally sought, as CKCU has, to withdraw from their insurance contracts. More recent authority suggests that <u>Hazelwood</u>'s narrow rule does not apply to this kind of situation. See <u>Lee v. Occidental Life Ins. Co.</u>, 291 S.W.2d 273, 276 (Tenn. App. 1956) (holding that "the <u>Hazelwood</u> case is not authority" where the certificate issued to the plaintiff stated that it was subject to subsequent bylaw amendments). We decline to extend the holdings in <u>Hazelwood</u> and <u>Gaut</u> to the facts of this case.

### E. Reasonableness of the 1987 bylaw amendment

The parties agree that, under Tennessee law, "[a]mendments to the Bylaws of a mutual organization are enforceable as long as they are reasonable and do not deprive a

17

member of a vested right." See Mutual Guar. Corp. v. Arsenal Credit Union, 771 F.Supp. 288, 291 (E.D. Mo. 1991). CKCU argues that the 1987 bylaw amendment was unreasonable and therefore unenforceable. The district court held that, as a matter of law, based on the undisputed facts, "[t]he amendment was a reasonable way for [Mutual Guaranty] to shore up its capital needs, to strengthen the fund's viability, to work toward a public perception of private insurance being stable and adequately funded, to secure a competitive position with federal insurance, and to slow down withdrawals that could jeopardize [Mutual Guaranty's] ability to protect remaining members." Aplt's Br., Addendum at 28. The court further held that the doctrine of laches barred CKCU from challenging the amendment.

CKCU offers five grounds on which to find the bylaw unreasonable: (1) the one hundred percent forfeiture was unprecedented and not reasonably foreseeable, Aplt's Br. at 31; (2) Mutual Guaranty provided insufficient notice of the bylaw amendment, such that it would have been impossible for a credit union to withdraw before the amendment had become effective, id. at 32; (3) the penalty was designed to "lock in" members to prevent withdrawals, id. at 32-33; (4) the bylaw "fail[ed] to take into consideration that [CKCU's] withdrawal was not a matter over which [CKCU] possessed control" because the withdrawal was practically required by Kansas law, id. at 33; (5) Mutual Guaranty "enforced the . . . forfeiture provision against the Kansas credit unions, but not against the Tennessee credit unions," which now "stand to profit from" Mutual Guaranty's retention

18

of the forfeited funds, id. at 34-35. CKCU also argues that the district court improperly

relied on Arsenal Credit Union in concluding that the bylaw was reasonable. CKCU

urges that, in any event, it was error for the district court to determine the reasonableness

of the bylaw as a matter of law on summary judgment.[4] Mutual Guaranty counters that

the question of reasonableness is one of law, properly determined by the court on

summary judgment, and further that the district court was correct in its substantive

determination that the forfeiture provision was not unreasonable.

We review first whether it was proper to decide this issue on summary judgment.

Because we conclude that it was, we then review the district court's substantive holding

that the amendment was reasonable.


*1. Deciding the issue on summary judgment*

Summary judgment is properly granted "[i]f there is no genuine issue of material

fact in dispute." Wolf, 50 F.3d at 796; see Fed. R. Civ. P. 56. Here, the underlying facts

are uncontested. The district court therefore held that "the reasonableness of an

amendment is an issue of law for the court." Aplt's Br., Addendum at 28. CKCU

contends that "[q]uestions of reasonableness are quintessential issues of fact," which

therefore should be submitted to a jury. Aplt's Br. at 31. To support this contention,

---

[4]     CKCU also argues that the district court erred in holding that the doctrine of
laches bars CKCU's challenge to the reasonableness of the bylaw. Because we hold that
the bylaw was reasonable, we do not reach this question.

19

however, CKCU cites only two cases: a decision of the Supreme Court of Kansas holding that "what is a commercially reasonable sale" under the Uniform Commercial Code is a question of fact, Garden Nat'l Bank v. Cada, 738 P.2d 429, 430 (Kan. 1987), and a decision of the U.S. District Court for the District of Rhode Island holding that "[w]here there exist disputed facts concerning the reasonableness of withholding consent to an assignment, that issue should be decided by the trier of facts." Thompson Trading, Ltd. v. Allied Breweries Overseas Trading, Ltd., 748 F.Supp. 936, 942 (D.R.I. 1990). On the other hand, Mutual Guaranty argues that, "[s]ince the turn of the century, Tennessee courts have been determining the reasonability of bylaws" as a matter of law. Aple's Br. at 29.

Because whether the reasonableness of bylaws is a legal or factual issue is itself a substantive question, we apply the choice of law rules of the forum state. See Missouri Pacific R.R. Co. v. Kansas Gas & Elec. Co., 862 F.2d 796, 798 n. 1 (10th Cir. 1988). Under Kansas law, subject to specified inapplicable exceptions, the parties to a contract may determine which state's law shall govern the rights and duties of the parties, so long as the chosen state bears a "reasonable relation" to the transaction. Mark Twain Kan. City Bank v. Cates, 810 P.2d 1154, 1158-59 (Kan. 1991); Kan. Stat. Ann. § 84-1-105. Here, CKCU and Mutual Guaranty agreed in the contract of insurance that the "contract shall be governed by the laws of the State of Tennessee." Aplt's App. vol. I at 61. The contract of insurance was the vehicle through which CKCU "agree[d] to comply with the

20

bylaws of [Mutual Guaranty] as time to time amended," and the parties agreed explicitly that the contract itself could "be amended by an amendment to the bylaws." Id. at 48. Hence, insofar as CKCU has an interest in Mutual Guaranty's bylaws, that interest flows through the contract of insurance. Therefore, the law of Tennessee governs any substantive claims relating to the bylaws, including CKCU's claim that the reasonableness of the 1987 amendment is a question of fact.

But as neither Tennessee nor the parties volunteer much law to help us, we look more broadly to determine the general rule. The parties cite different, seemingly contradictory phrases from the same section of the same treatise on corporations. Compare 8 William M. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 4191 (perm. ed. rev. vol. 1992) ("Generally speaking, a claim that a particular bylaw is invalid because unreasonable presents a question of law for the court rather than one of fact for the jury, although the question may be presented as one of fact.") with id. ("[T]he reasonableness of bylaws is a question of fact, subject to limited review on appeal."). Although the question is close, our own research reveals more support for the proposition that the reasonableness of the bylaws of a mutual corporation is a question of law that is properly decided by the court on summary judgment. See McKee & Co. v. First Nat'l Bank, 265 F.Supp. 1, 13 (S.D. Cal. 1967) (granting summary judgment on the question of "the reasonableness of the new bylaws" of a banking association and holding explicitly that "reasonableness is a question of law and not of fact"); 36 Am. Jur. 2d *Fraternal*

21

*Orders* § 22 (1968) ("Where the facts are undisputed, the question whether a change or amendment of the bylaws of a fraternal order and benefit society is reasonable is one of law for the court."); Fletcher, supra, § 4191 n. 23 (citing cases). Cf. South Fla. R.R. Co. v. Rhoads, 5 So. 633, 634-35 (Fla. 1889) ("The reasonableness of rules prescribed by railroad companies, and like corporations with like powers, is a question of law to be decided by the courts, and not a question of fact to be decided by juries."). But see Brennan v. Minneapolis Soc'y for the Blind, Inc., 282 N.W.2d 515, 521 (Minn. 1979) ("Because the unreasonableness of bylaws [of a non-profit corporation] is a question of fact, the findings of the trier of fact will not be disturbed if the evidence as a whole sustains the findings.") (citations omitted); Allen v. Gleaner Life Ins. Soc'y, 264 N.W. 332, 333 (Mich. 1936) (holding that the "reasonableness" of the bylaws of an insurance society "depends upon the particular circumstances and matters in pais, and is therefore a question for the jury"). Although no Tennessee court has had occasion recently to address the issue, the Tennessee Supreme Court appears at least not to have countermanded this general rule. See Lee, 291 S.W.2d at 277 (affirming the trial court's determination that an insurance company's bylaw was reasonable).

We conclude that it was proper for the district court to decide the reasonableness issue on summary judgment. See Kansas Teachers Credit Union v. Mutual Guar. Corp., No. 94-1524-DES, 1996 WL 109495, at *5-6 (D. Kan. Feb. 29, 1996) (holding that Mutual Guaranty's 1987 bylaw amendment was reasonable as a matter of law);

22

Telephone Employees' Credit Union v. Mutual Guar. Corp., No. 89 CV 871, slip op. at

12-14 (D. Kan. March 11, 1994) (same); Mutual Guar. Corp. v. Arsenal Credit Union,

771 F.Supp. at 291-92 (granting summary judgment to Mutual Guaranty and rejecting its

member credit union's counter-claim that the 1987 bylaw amendment was unenforceable

where the credit union did not contend that Mutual Guaranty had contravened prescribed

amendment procedures or deprived it of a vested right).


## 2. *Substantive resolution of the "reasonableness" question*

We further hold that the district court was correct in its determination that, as a

matter of law, the forfeiture provision was reasonable. The record reflects the undisputed

fact that Mutual Guaranty faced an environment in which confidence in private insurance

was eroding due to both an industry crisis and the threat of state legislation requiring

credit unions to obtain federal insurance. In this context, an amendment increasing the

amount forfeited from thirty percent[5] to one hundred percent was a reasonable means of

slowing withdrawals which could have threatened Mutual Guaranty's founding purpose:

to protect and guarantee share holdings and insured accounts and to advance the general

welfare of its member credit unions.

---

[5]     In 1982, Secured Savings' bylaws provided for a maximum forfeiture of
fifty percent of the capital contribution of a withdrawing member. In 1983 or 1984 (the
record does not provide the exact date), the bylaws were amended to permit a forfeiture of
up to thirty percent of a withdrawing member's capital contribution.

We also note several other undisputed facts appearing in the record which constitute convincing evidence of the reasonableness of the bylaw. CKCU President Ron Ogle was a member of the board of directors of Mutual Guaranty in 1987 when the amended forfeiture provision was adopted; he was present at the meeting at which the amendment was adopted; and he voted in favor of the amendment. True, Mr. Ogle testified that, in playing the dual role of director of Mutual Guaranty and president of CKCU, he "cast [his] vote in a fashion that was in the interest of [Mutual Guaranty], not in a fashion that was in the interest of [CKCU] or any other person" and that, when he "sat and served on the board of directors of [Mutual Guaranty, he] did not act as a representative of" CKCU. Aplt's App. vol. II, at 395. However, this testimony does not raise a genuine issue as to a material fact in light of other undisputed evidence.

The amendment was subsequently discussed at a CKCU board of directors' meeting on October 15, 1987. The minutes of that meeting reflect no concerns by any CKCU director that Mutual Guaranty's recently adopted forfeiture provision was unreasonable. The relevant paragraph in the minutes is worth quoting because it indicates that the view of the amendment taken by CKCU directors at the time was generally positive:

> Ron Ogle presented letters from Mutual Guaranty Corporation. The cost of
> private insurance is going up. They are setting a special assessment of one
> half of one percent, which in our case equals approximately $100,000. The
> Kansas Department of Credit Union Administrator has not ruled on the
> accounting for this special assessment. It could be an additional asset, or an
> expense. [Mutual Guaranty] has also set a locked door policy - there will be

24

a 100% penalty to get out of this insurance. <u>These two changes will make [Mutual Guaranty] the strongest insurer, in terms of risk / capital.</u>

Aplt's App. vol. II, at 331 (emphasis added). This evidence strongly suggests that the amendment appeared reasonable to CKCU's directors as long as CKCU benefited from the added security the forfeiture provision gave to Mutual Guaranty. CKCU decided the amendment was "unreasonable" only after it withdrew from Mutual Guaranty and forfeited its own capital contribution.

CKCU complains that even if the forfeiture provision was not unreasonable on its face, it was unreasonable to enforce it against CKCU. It argues that its "withdrawal was not a matter over which [CKCU] possessed control," because the action was compelled by the amendment to Kan. Stat. Ann. § 17-2246 requiring credit unions to obtain federal insurance. Aplt's Br. at 33. This characterization of the events leading to the amendment of § 17-2246 is misleading. Mutual Guaranty suggests that CKCU itself supported this change in Kansas law, claiming that "[i]n 1991, the Kansas Credit Union League, in which CKCU was an active member, began lobbying for an amendment to K.S.A. 17-2246 that would require every Kansas credit union not then insured by [NCUSIF] to obtain insurance from that entity within 18 months." Aple's Br. at 7. Although Mutual Guaranty points to no support in the record for this claim, CKCU does not deny it. CKCU instead points to Mr. Ogle's testimony that CKCU did not "instruct" the League to lobby for the amendment and that the League's activities were "not within the control of" CKCU. See Aplt's App. vol. II, at 396. But as the district court pointed out, CKCU

25

tellingly does not argue that it opposed the passage of the League's legislative initiative. In our view, CKCU's silence on this matter greatly weakens its claim that events beyond its control forced its withdrawal from Mutual Guaranty, and thereby undermines the argument that it was unreasonable to apply the forfeiture provision to CKCU. While CKCU's contemporaneous reaction to the bylaw amendment is not dipositive of the amendment's reasonableness, it is relevant that CKCU has presented no evidence that it considered the one hundred percent forfeiture provision to be unreasonable under the circumstances the parties were then facing.

CKCU also contends that the one hundred percent forfeiture provision was unprecedented. To the contrary, although such provisions are not common, they are not unprecedented. See United Employees Credit Union v. Massachusetts Credit Union Share Ins. Corp., 403 N.E.2d 408 (Mass. 1980) (upholding a similar provision). Finally, we note that, according to an undisputed averment in the affidavit of Mutual Guaranty's president during the relevant period, the one hundred percent forfeiture provision was recommended to Mutual Guaranty by the Tennessee Commissioner of Financial Institutions. Aplt's App. vol. I, at 239. This evidence, which CKCU did not rebut, further precludes a determination that the bylaw amendment was an unreasonable measure.

Our review of "the record taken as a whole," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First Nat'l Bank of Ariz. v. Cities Serv.

26

Co., 391 U.S. 253, 289 (1968)), compels the conclusion that the bylaw is reasonable and therefore enforceable. We therefore hold that the district court was correct in granting summary judgment to Mutual Guaranty as to this issue. See Kansas Teachers Credit Union, 1996 WL 109495, at *5-6 (granting summary judgment to Mutual Guaranty on the same issue); Arsenal Credit Union, 771 F.Supp. at 291-92 (same); Telephone Employees' Credit Union, No. 89 CV 871, slip op. at 12-14 (holding that Mutual Guaranty's 1987 bylaw amendment was reasonable as a matter of law).

## F. 1991 Amendment to Kan. Stat. Ann. § 17-2246

In 1991, the Kansas legislature amended Kan. Stat. Ann. § 17-2246, adding in relevant part:

> (f) No bylaw amendment of any nonfederal insurer shall be binding upon any Kansas credit union unless and until approved by the Kansas state department of credit unions.

1991 Kan. Sess. Laws 616. CKCU argues that this provision should be applied retroactively to Mutual Guaranty's 1987 bylaw amendment, and that the bylaw amendment is therefore not binding on CKCU because Mutual Guaranty did not obtain the prescribed approval. The district court held that the statute did not apply retroactively. We review de novo the question of the retroactivity of a state statute. See Quinlan v. Koch Oil Co., 25 F.3d 936, 940-41 (10th Cir. 1994).

27

Under Kansas law, a statutory amendment is not given retroactive application unless it either "clearly indicates" such legislative intent or is procedural or remedial in nature and does not affect the substantive rights of the parties. Nitchals v. Williams, 590 P.2d 582 (Kan. 1979). CKCU argues that the amendment is procedural because it "only affects the procedure by which a private insurer may effectuate an amendment to its bylaws." Aplt's Br. at 39.

It is clear from the cases that CKCU itself cites that "procedure" in this context refers only to "the mode of proceeding by which a legal right is enforced." Nitchals, 590 P.2d at 587. See also State v. Chapman, 814 P.2d 449, 451 (Kan. App. 1991) (defining procedural or remedial law as "that which prescribes methods of enforcement of rights or obtaining redress"). Here, the statutory amendment affects Mutual Guaranty's substantive right to change its bylaws without state approval. It has nothing whatsoever to do with the mode of seeking redress. Because it is substantive and not procedural, and because there is no clear indication of contrary legislative intent, the amendment is therefore not applied retroactively to Mutual Guaranty's 1987 bylaw amendment.

### G. CKCU's signature on the 1987 bylaw amendment

CKCU points to a provision in its contract of insurance with Mutual Guaranty that incorporates the terms of the 1982 merger agreement between Mutual Guaranty and Secured Savings "to the extent applicable to [CKCU]." Aplt's App. vol. I, at 61. The

28

1982 agreement requires a signed writing by the parties in order to amend the agreement in any manner affecting the rights and responsibilities of the parties. CKCU thus presents a tortured argument that its signature is required on any bylaw amendment that affects its rights.

The district court cited several reasons for rejecting this argument. Applying de novo review to the district court's interpretation of the insurance contract, Federal Kemper Life Assurance Co. v. Ellis, 28 F.3d 1033, 1038 (10th Cir. 1994), we conclude that the signature provision in the merger agreement should not be incorporated into CKCU's insurance contract. The insurance contract calls for incorporation of the terms of the merger agreement "to the extent applicable to [CKCU]." Aplt's App. vol. I, at 61. The district court correctly concluded that this standard clause in the merger agreement was not in any way "applicable" to CKCU. Mutual Guaranty argues that the parties' intent was only to incorporate into the insurance contract a particular provision in the merger agreement, which relates to CKCU's separately negotiated liability for obligations SSCU owed to financially troubled member credit unions. We think this reading is far more plausible than CKCU's construction. The insurance contract expressly provides that it may be amended by an amendment to the bylaws of Mutual Guaranty, provided only that Mutual Guaranty give notice of amendments to CKCU. If the parties had intended that all amendments must also be signed by CKCU, they could have so stated in the contract. Moreover, reading such a requirement into the insurance contract would

29

render the notice provision meaningless.  We decline to read such a requirement into the contract of insurance.  In deciding to press this argument on appeal, CKCU would have done well to observe that "[l]egal contentions, like the currency, depreciate through overissue."  Jones v. Barnes, 463 U.S. 745, 751 (1983).  This one should have been weeded out.

## H.  Timely notice of the bylaw amendment

The contract of insurance between CKCU and Mutual Guaranty provided:

> The Credit Union further agrees that this contract may be amended by an amendment to the bylaws of the corporation, provided the Corporation shall mail written notice of such amendment to the Credit Union at least ten (10) days prior to the effective date of such amendment.

Aplt's Br., Addendum at 33.  Mutual Guaranty's board adopted the bylaw amendment at issue by resolution on October 1, 1987.  It is undisputed that Mutual Guaranty provided formal written notice of the bylaw amendment on October 2.  CKCU concedes that the amendment applied only to "credit unions that fail to withdraw by October 12, 1987." Aplt's Br. at 45.  The district court thus held that Mutual Guaranty's notice to CKCU, coming ten days before the effective date of the amendment, was timely.  We apply de novo review to the district court's factual findings on summary judgment, Wolf, 50 F.3d at 796.

CKCU urges us to require Mutual Guaranty to "strictly comply with the manner prescribed for amending [its] bylaws."  Aplt's Br. at 44.  Strictly speaking, CKCU argues,

30

the Mutual Guaranty board made the amendment effective upon adoption on October 1, and therefore Mutual Guaranty's letter dated October 2 did not constitute timely notice.

Our review of the record leads us to agree with the district court that the effective date of the amendment was October 12, because any credit union withdrawing before that date was not subject to the provisions of the amendment. Therefore, the October 2 letter provided the ten days' notice required by the contract, and CKCU has brought to our attention no genuine issue of material fact as to this determination.

## III. CONCLUSION

Having considered and rejected each of CKCU's claims relating to the 1987 bylaw amendment, we conclude that the district court properly granted Mutual Guaranty's, and denied CKCU's, motion for summary judgment. The order of the district court is therefore AFFIRMED.