**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 26 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

GEORGE N. FREEMAN,

      Plaintiff - Appellant,

v.

UNITED AIRLINES, a Delaware
corporation,

      Defendant - Appellee.

No. 01-1397
D.C. No. 00-WY-1630-CB
(D. Colorado)

**ORDER AND JUDGMENT** *

Before **HENRY** , **BRORBY** , and **LUCERO** , Circuit Judges.

After examining the briefs and appellate record, this panel has determined

unanimously that oral argument is not necessary to the disposition of this appeal.

See Fed. R. App. P. 34(a)(2)(C); 10th Cir. R. 34.1(G). The case is therefore

ordered submitted without oral argument.

---

    * This order and judgment is not binding precedent, except under the
doctrines of res judicata, collateral estoppel, and law of the case. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

In this diversity action, George Freeman appeals the district court's grant of summary judgment against him and in favor of United Airlines on his wrongful discharge claims under Colorado law. Mr. Freeman alleges that United terminated his employment in retaliation for his complaints about unlawful activity and his filing of a workers' compensation claim. In rejecting Mr. Freeman's claims on summary judgment, the district court reasoned that under Colorado law, Mr. Freeman was required to prove that he had been actually or constructively discharged and that no such discharge had occurred: United had merely placed Mr. Freeman on medical leave. The court also concluded that Mr. Freeman's remaining on medical leave resulted from "his own intransigence." Aplt's App. at 125 (Dist. Ct. Order, filed July 19, 2001, at 5).

We conclude that the district court properly granted summary judgment to United. The record does not contain evidence supporting the inference that Mr. Freeman was actually or constructively discharged or that United placed Mr. Freeman on medical leave in retaliation for the filing of a workers' compensation claim or whistleblowing activity.

## I. BACKGROUND

Mr. Freeman began working for United as a mechanic in 1987. According to Mr. Freeman, he complained to his supervisor (Dave Szasbos) about the

handling and storage of hazardous wastes on numerous occasions throughout 1997 and 1998. During this same period of time, Mr. Freeman also complained about United's recycling of freon canisters, in violation of Department of Transportation regulations, and about lax security procedures at United gates, in violation of Federal Aviation Administration laws and regulations. Mr. Freeman alleged that his supervisor did not respond to these complaints and that he was subject to harassment and ridicule by coworkers because he had raised these concerns.

In August 1998, Mr. Freeman suffered a shoulder injury and filed a claim for workers' compensation. Although United placed him on light duty status, Mr. Freeman maintained, his supervisor continued to assign a normal workload for about a month, in violation of restrictions recommended by a physician. Additionally, Mr. Freeman asserted, United did not allow him to obtain physical therapy during working hours.

On January 15, 1999, at 4:00 a.m., Mr. Freeman telephoned his union representative (Dave Kerns) and left a message expressing his concerns about working at United. Later that morning, Mr. Freeman spoke with Mr. Kerns about these issues. At some point in the conversation, Mr. Freeman stated that he "didn't want anyone to get hurt." Aplee's App at 171. Mr. Freeman also suggested that he might resign.

In light of that conversation, Mr. Kerns became concerned about Mr. Freeman's psychological state. He conferred with United management and requested that the company suspend Mr Freeman from work. United did so, referring Mr. Freeman to the company's Employee Assistance Program (EAP). In February and March, Mr. Freeman met with an EAP counselor. On March 25, 1999, the counselor concluded that Mr. Freeman was able to perform his regular duties.

In spite of this recommendation, United management and several of Mr. Freeman's coworkers continued to have concerns about Mr. Freeman's fitness for work. At the request of Mr. Freeman's supervisor (David Szabos), two coworkers (Henry Ferne and Kenneth Dresel) prepared written statements.

Mr. Ferne reported that Mr. Freeman continually engaged in "abusive and intimidating behavior," Aplee's App. at 72, had admitted to being an alcoholic, had made suggestive remarks about Mr. Ferne's daughters, and had had fits of anger in the break room. Additionally, Mr. Ferne reported that he had witnessed Mr. Freeman hit another mechanic because that mechanic had jokingly poked Mr. Freeman in the ribs. On this occasion, Mr. Freeman apparently stated that he "was jumpy enough without other people fucking with him." Id. Finally, Mr. Ferne reported the following incident:

> [Mr. Freeman] asked [me] back into the Fire Pump Room
> and tried to hand me a condom. I asked him what this was

and he said he wanted a load of semen from me. I was shocked and embarrassed. I asked him why[. H]e said I think you know why. So I asked him if he was telling me he was a "homosexual." He said, "No, I think you know better than that, Hank." Like I should understand why he needed my semen. I was afraid at this point. I asked him "why do you want my semen?" He told me that he needed to "reprogram his brain" to gain a "higher understanding of us." He said these "voices in my head" were telling him to take the semen and "put it up his butt" to "reprogram his brain." He said it was like rebooting a computer.

Id. at 72-73. Mr. Ferne concluded: "I don't want to work around this [g]uy. I feel he is possibly violent, certainly a danger to himself as well as others." Id. at 74-75.

In his written statement, the second coworker, Mr. Dresel (a building maintenance lead mechanic) reported that, with one exception, the members of his group had refused to work with Mr. Freeman. Mr. Dresel also reported a tense confrontation in which Mr. Freeman refused to answer questions about replacing equipment and then accused Mr. Dresel of splashing unsanitized water on him. Mr. Dresel said he thought that Mr. Freeman was paranoid and that he was "in such a bad state of mind [that] I thought he may have snapped." Id. at 84.

Based on this information, Dr. Jack Rubino, a United Airlines medical officer, referred Mr. Freeman to Dr. John Nicoletti, an independent psychologist. Dr. Nicoletti conducted an evaluation and reached the following conclusions:

Mr. Freeman . . . had a significant elevation on the Paranoia Scale to the point of indicating a significant

thought disorder, ideas of reference and mistaken beliefs. He is vengeful and brooding [and] there may be a tendency for him to act upon his delusions. Mr. Freeman is angry and resentful. He tends to display blame and criticism on other people. He is rigid, stubborn and hostile. Mr. Freeman may have a tendency to misinterpret social situations. He has unusual beliefs, bizarre thoughts and is withdrawn and alienated. Mr. Freeman's scores on the Contents Scale also indicated significant elevations in the areas of anxiety and depression. The testing also indicates bizarre mentation. This elevation indicates a psychotic thought process. There may be a tendency for him to report auditory or visual hallucinations. His thoughts are strange or peculiar. He may also have paranoid ideation. Mr. Freeman also had elevations in anger, cynicism and antisocial practices. He appears to be experiencing both family and work conflict.

Mr. Freeman's scores on the Supplemental Scales also indicate addictive personal characteristics, alcohol addiction admission and alcohol addiction potential.

. . . .

The combined results of the psychological interview, psychological testing and collateral data indicate an individual who falls in the Moderate to Severe category of risk. Specifically, Mr. Freeman has a significant number of personality traits and behavior patterns associated with violence. . . .

It is reasonable to assume that if Mr. Freeman returns to the same work environment in his current emotional state, without any significant interventions, his impulse control problems will either continue or accelerate. In addition, because of the concerns voiced by his coworkers, placing him back in the same work environment would appear to be very disruptive [and] would probably lead to more fear on the part of the employees and coworkers along with providing Mr.

Freeman with a potential environment for encountering a trigger event.

Id. at 89-91 (emphasis omitted). Dr. Nicoletti recommended that Mr. Freeman undergo regular and ongoing psychotherapy and anger management and that he be referred to an alcohol treatment program. Dr. Rubino then informed Mr. Freeman that he could return to work if he complied with Dr. Nicoletti's recommendations.

Subsequently, on May 23, 1999, United sent Mr. Freeman a letter informing him that he would be placed on extended illness status (EIS) pursuant to the provisions of article XV of United's collective bargaining agreement with its mechanics.[1] The letter stated that Mr. Freeman might "be required to submit to

---

[1] Article XV provides in part that:

An employee who exhausts his sick leave or who is off work because of illness or injury longer than sixteen (16) days shall be placed on extended illness status up to a maximum of two (2) years from the first day placed on extended illness status. . . .

B. While on extended illness status, the employee:
  1. shall retain and continue to accrue seniority.
  2. may continue insurance coverages according to the provisions of the Company's insurance plan.
  3. may be granted free or reduced rate transportation privileges . . . upon request to his supervisor.

(continued...)

physical examinations at Company request or to furnish medical reports of you[r]

current condition." Id. at 96.

During May and June 1999, Mr. Freeman obtained counseling from Dr.

Warren K. Boos. He had seven sessions with Dr. Boos, and, in August 1999, Dr.

Boos provided United with a clinical narrative.

On September 16, 1999, United requested an additional clinical narrative

report. United informed Mr. Freeman that a failure to comply with this request

could result in revocation of EIS status and termination of his employment.

---

[1](...continued)

> 4. may be required to submit to physical examinations at Company request or to furnish medical reports of his current physical condition. . . .
> 5. shall not accrue or be entitled to any other employee benefits, such as vacation accrual, sick leave accrual, holiday pay et cetera, except that an employee who is off work because of occupational illness or injury will continue to accrue vacation credit.
>
> C. If while on extended illness status, the employee accepts employment elsewhere without prior approval by the Company and the Union, he shall be deemed to have severed his employee relationship with the Company.

Aplee's App. at 31-32.

In spite of United's request, Mr. Freeman did not submit an additional clinical narrative report. In deposition testimony he explained:

> I did tell [United] that I would keep them posted . . . . I didn't, though. I just gave up on therapy and realized that it didn't matter what I did, they weren't going to let me go back to work.
>
> . . . .
>
> . . . I just sat down and took stock of all the things I had done to try to comply with their concern of one phone call eight months earlier. It seemed to me like I had put a concerted effort into trying to resolve that issue, but they had made up their minds that they weren't going to let me come back. They were going to stall me out indefinitely.

Id. at 48.

Mr. Freeman filed the instant action against United in the district court on April 15, 2000. Although he initially asserted a claim under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, Mr. Freeman's Second Amended Complaint asserted only claims under Colorado law for: (1) retaliatory discharge on the basis of his filing a workers' compensation claim; (2) retaliatory discharge on the basis of his whistleblowing activities (in violation of public policy).

In a July 19, 2001 order, the district court granted summary judgment to United on the grounds that Mr. Freeman had failed to prove that he had been actually discharged. The court reasoned that, under Colorado law, "claims for

-9-

wrongful discharge ipso facto require that the claimant be actually or constructively discharged." Aplt's App. at 125 (Dist. Ct. Order, filed July 19, 2001, at 5). Here, the court reasoned, "[n]o such discharge occurred in this case, merely medical leave." As an alternative ground for the grant of summary judgment to United, the district court stated that "[the fact that] Plaintiff has remained on EIS is due to his own intransigence, and the Court declines to second guess the recommendations of Defendant's psychologist." Id.

## II. DISCUSSION

On appeal, Mr. Freeman argues that the district court erred in concluding that Colorado law required him to prove an actual or constructive discharge in order to prevail on his retaliation claims. Mr. Freeman's argument is based on two sources: (1) the Colorado Court of Appeals's decision in Lathrop v. Entenmann's, Inc., 770 P.2d 1367, 1372-73 (Colo. Ct. App. 1989); and (2) the rule adopted in many federal cases (under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e—2000e-17, and the ADA, for example) that employees subject to "adverse employment actions" less severe than termination (e.g., demotion or transfer) may still bring claims based on alleged retaliation. The gist of Mr. Freeman's contention is that, even though leading Colorado cases refer to the various plaintiff employees' discharges, the rationale of these decisions

(furthering important public policies by protecting employees who exercise their rights) applies to actions that are less severe than discharge—such as his placement on EIS.

Because the district court resolved the case on summary judgment, we review its decision on this issue de novo, applying the same legal standard employed by the district court pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. See Cent. Kan. Credit Union v. Mut. Guar. Corp., 102 F.3d 1097, 1102 (10th Cir. 1996). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We construe the evidence in the light most favorable to the nonmoving party (here, the plaintiff Mr. Freeman). See Cent. Kan. Credit Union, 102 F.3d at 1102. In this diversity action, we apply the substantive law of Colorado. Sellers v. Allstate Ins. Co., 82 F.3d 350, 352 (10th Cir. 1996).

Applying those standards, we are not persuaded by Mr. Freeman's argument. In reaching that conclusion we first review the Colorado law regarding wrongful discharge and then turn to Mr. Freeman's specific arguments regarding the Colorado Court of Appeals' decision in Lathrop and federal decisions regarding "adverse employment actions" not involving termination.

## A. Wrongful Discharge Claims Under Colorado Law

Under Colorado law, an at-will employee may assert a claim that he or she has been terminated in violation of public policy. In order to prevail on such a claim, the at-will employee must establish the following elements:

> [1] that the employer directed the employee to perform an illegal act as part of the employee's work related duties or prohibited the employee from performing a public duty or exercising an important job-related right or privilege; [2] that the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker; and [3] that the employee was terminated as the result of refusing to perform the act directed by the employer . . . . [and] [4] that the employer was aware, or reasonably should have been aware, that the employee's refusal to comply with the employer's order or directive was based on the employee's reasonable belief that the action ordered by the employer was illegal, contrary to clearly expressed statutory policy relating to the employee's duty as a citizen, or violative of the employee's legal right or privilege as a worker.

Martin Marietta Corp. v. Lorenz, 823 P.2d 100, 109 (Colo. 1992) (emphasis added).

Colorado courts have applied this framework to claims alleging retaliatory discharge on the basis of the filing of a workers' compensation claim. In Lathrop, the court held that "since an employee is granted the specific right to apply for and receive compensation under the [Workmen's Compensation Act of Colorado,

-12-

Col. Rev. Stat. §§ 8-40-101—8-66-112], an employer's retaliation against such an employee for his exercise of such right violates Colorado's public policy." 770 P. 2d at 1373. Thus, "the violation of such public policy provides the basis for a common law claim by the employee to recover damages sustained by him as a result of that violation." Id.

Here, the district court applied this framework to reject Mr. Freeman's claims. Because Mr. Freeman remained on EIS, the court reasoned, he could not establish one of the necessary elements, and United was thus entitled to judgment as a matter of law.

## B. Lathrop

In challenging the district court's conclusion, Mr. Freeman relies on Lathrop. There, he notes, the Colorado Court of Appeals reversed a lower court decision dismissing a claim for workers' compensation retaliation even though the plaintiff had been placed on a "medical absence" rather than being formally fired. Id. at 1368. Mr. Freeman maintains that his placement on EIS status is analogous to the medical leave in Lathrop.

We disagree, for Mr. Freeman reads Lathrop much too broadly. In that case, the plaintiff's theory was that the "medical absence" constituted a constructive discharge. See id. at 1369. He alleged that his employer had refused

-13-

to allow him to return to work even though he had obtained permission from a doctor to do so. Thus, Lathrop does not abandon the rule that, in order to assert a wrongful discharge claim under Colorado law, an employee must assert at least a constructive discharge.

Under Colorado law, the determination of whether an employer's actions constitute a constructive discharge depends upon whether a reasonable person under the same or similar circumstances would view the working conditions as intolerable. See Boulder Valley School Dist. R-2 v. Price, 805 P.2d 1085, 1088 (Colo. 1991), overruled in part on other grounds by, Community Hosp. v. Fail, 969 P.2d 667 (Colo. 1998). The subjective view of the individual employee is not determinative. Id. Here, Mr. Freeman has not offered any evidence from which a reasonable factfinder could conclude that he was constructively discharged. The record indicates that Mr. Freeman had the right to come back to work if he completed a course of psychotherapy and an alcohol treatment program and that he retained seniority and other benefits. Although Mr. Freeman stated in his own affidavit and deposition testimony that Dr. Nicolletti's evaluation was biased and unreliable, Mr. Freeman's conclusory statements are insufficient to controvert Dr. Nicoletti's professional opinion. Moreover, aside from these conclusory assertions, Mr. Freeman has failed to offer evidence indicating that the conditions that United imposed on him while on EIS—obtaining regular and ongoing

-14-

psychotherapy and anger management and participating in an alcohol treatment program—would be viewed by a reasonable person as intolerable   In fact, United appears to have gone to great lengths to assist Mr. Freeman.

### C.  Adverse Employment Actions under Federal Law

Mr. Freeman also invokes federal decisions holding that an employee may pursue a retaliation claim based on an adverse employment action less severe than termination.  In particular, he cites this circuit's decision in Sanchez v. Denver Public Schs., 164 F.3d 527, 532 (10th Cir. 1998).  There, in discussing Title VII and Age Discrimination in Employment Act claims, we explained that:

> The Tenth Circuit liberally defines the phrase "adverse employment action."  Such actions are not simply limited to monetary losses in the form of wages or benefits. Instead, we take a case-by-case approach, examining the unique factors relevant to the situation at hand. Nevertheless, we will not consider a mere inconvenience or an alteration of job responsibilities to be an adverse employment action.

Sanchez, 164 F.3d at 532 (citations and internal quotation marks omitted); see also Petersen v. Utah Dep't of Corrs., 301 F.3d 1182 (10th Cir. 2002) (discussing what constitutes an adverse employment action under Title VII).

Sanchez and similar cases applying federal statutes are not controlling in this diversity case, which is governed by Colorado law.  Because Colorado courts have not extended wrongful discharge actions based on violations of public policy

-15-

to actions less severe than termination, we may not apply the broader "adverse employment action" standard here. Moreover, as United has noted, the issue of whether wrongful discharge actions should be available outside the termination context involves important policy questions that, in a case governed by Colorado law, would be inappropriate for this court to address in the first instance. Compare Mintz v. Bell Atl. Sys. Leasing Int'l, Inc., 905 P.2d 559, 562 (Ariz. Ct. App. 1995) (refusing to create the tort of wrongful failure-to-promote and stating that "'[r]ecognizing a retaliation tort for actions short of termination could subject employers to torrents of unwarranted and vexatious suits filed by disgruntled employees at every juncture in the employment process'") (quoting Ludwig v. C&A Wallcoverings, Inc., 960 F.2d 40, 43 (7th Cir. 1992))) with Brigham v. Dillon Cos., 935 P.2d 1054, 1059 (Kan. 1997) (stating that "a new cause of action [under Kansas law] for retaliatory demotion is a necessary and logical extension of the cause of action for retaliatory discharge"). Finally, even under the case-by-case approach of Sanchez, there are serious questions as to whether Mr. Freeman's EIS placement would constitute an "adverse employment action."

## D. Evidence of Retaliatory Motive

The district court's grant of summary judgment to United may be affirmed on an alternative ground: even if Colorado law did recognize retaliation claims

based on adverse employment actions less severe than termination, and even if United's placement of Mr. Freeman on EIS status constituted such an adverse employment action, the record still does not contain evidence from which a factfinder could conclude that United acted with retaliatory intent.

As we have noted, United presented the report of Dr. Nicoletti and written statements from two of Mr. Freeman's coworkers. These materials establish that United had legitimate concerns that, if Mr. Freeman was allowed to remain at work, he would constitute a threat to his own safety and the safety of others.

In his response to United's summary judgment motion, Mr. Freeman did attempt to rebut United's evidence on this point to some degree. He submitted his own affidavit, in which he contended that Dr. Nicoletti was biased. Mr. Freeman also noted that Dr. Nicoletti's written report acknowledged that Dr. Nicoletti had not validated certain factual information provided by Mr. Freeman and United (e.g., his history of substance abuse and particular conflicts at work). Mr. Freeman also noted that, in deposition testimony subsequent to their written statements, his coworkers qualified their concerns about working with Mr. Freeman. For example, Mr. Ferne explained that Mr. Freeman did not appear inebriated on the job and that when Mr. Ferne submitted the written statement explaining his concerns about Mr. Freeman, Mr. Ferne himself was "extremely paranoid," partly because he was going through a difficult divorce. Aplee's App.

at 151.  Similarly, Mr. Dresel stated that his negative experiences with Mr. Freeman were "rather limited."  Id. at 154.

In our view, the evidence submitted by Mr. Freeman is insufficient to create controverted issues of material fact as to United's motive in placing him on EIS status.  Mr. Freeman's conclusory challenges to Dr. Nicoletti's evaluation do not undercut United's contention that it acted reasonably in relying on the psychologist's expert opinion.  Similarly, the coemployees' downplaying of their previous concerns about working with Mr. Freeman does not undercut the conclusion that United management was motivated by a legitimate concern for employee safety rather than by retaliation for whistleblowing activity or the filing of a workers' compensation claim.  Thus, even if the Colorado wrongful discharge cases could be applied outside the termination context, summary judgment in favor United and against Mr. Freeman would still be warranted.

### III. CONCLUSION

Accordingly, we AFFIRM the district court's grant of summary judgment to United and against Mr. Freeman.[2]

Entered for the Court,

Robert H. Henry
Circuit Judge

---

[2] In light of our disposition of this appeal, we deny United's Motion to Strike Appellant's Appendix as moot.